**Donald Ray EUBANKS, Appellant,**

v.

**The STATE of Texas, Appellee.**

Nos. 01–09–00826–CR, 01–09–00827–CR, 01–09–00828–CR, 01–09–00829–CR, 01–09–00830–CR, 01–09–00831–CR, 01–09–00832–CR, 01–09–00833–CR.

Court of Appeals of Texas, Houston (1st Dist.).

July 8, 2010.

---

Randy Schaffer, The Schaffer Firm, Houston, TX, for Appellant.

Rebecca Klaren, Assistant Criminal District Attorney, Galveston, TX, for Appellee.

Panel consists of Justices KEYES, HANKS, and HIGLEY.

## OPINION

EVELYN V. KEYES, Justice.

A jury convicted appellant, Donald Ray Eubanks, of two counts of indecency with a child, two counts of sexual performance by a child, two counts of possession of child pornography, and two counts of aggravated sexual assault of a child.[1] The jury assessed a total punishment of life in prison and $80,000 in fines. In seven issues, appellant argues that (1) the evidence was legally insufficient to establish that Bri. E.'s mouth contacted his penis; (2) the evidence was factually insufficient to establish that Bri.E.'s mouth contacted his pe-

nis; (3) the evidence was legally insufficient to establish that appellant produced a photo that included sexual conduct by a child; (4) the evidence was legally insufficient to establish that appellant possessed child pornography; (5) double jeopardy prohibits him from being convicted of both sexual performance by a child and possession of child pornography; (6) double jeopardy prohibits appellant from being convicted on two indictments for possession of child pornography that did not allege that he possessed different photos; and (7) the trial court abused its discretion in admitting photos seized from appellant's computer.

We affirm.

## Background

Appellant is the paternal grandfather of the complainants, Bri.E. and Bro.E. From

---

1. All eight cause numbers were tried together. Cause number 06CR3698 was for the offense of indecency with a child for touching Bri.E.'s genitals, resulting in appellate cause number 01-09-00826-CR. Cause number 06CR3699 was for the offense of indecency with a child for touching Bro.E.'s genitals, resulting in appellate cause number 01-09-00827-CR. *See* Tex. Penal Code Ann. § 21.11 (Vernon Supp. 2009) (stating elements for offense of indecency with a child). For both of these cause numbers, the jury found appellant guilty and assessed a punishment of 20 years in prison and a $10,000 fine.

   Cause number 07CR3399 was for the offense of sexual performance by a child for producing a performance from Bri.E., resulting in appellate cause number 01-09-00828-CR. Cause number 07CR3400 was for the offense of sexual performance by a child for producing a performance from Bro.E, resulting in appellate cause number 01-09-00829-CR. *See* Tex. Penal Code Ann. § 43.25 (Vernon Supp. 2009) (stating elements for offense of sexual performance by child). For both of these cause numbers, the jury found appellant guilty and assessed a punishment of 10 years in prison and a $10,000 fine.

   Cause numbers 07CR3401 and 07CR3402 were both for possession of child pornography, resulting in appellate cause numbers 01-09-00830-CR and 01-09-00831-CR, respectively. *See* Tex. Penal Code Ann. § 43.26 (Vernon 2003) (stating elements for offense of possession of child pornography). For both of these cause numbers, the jury found appellant guilty and assessed a punishment of 10 years in prison and a $10,000 fine for each offense.

   Cause number 09CR1188 was for aggravated sexual assault of a child for putting his mouth on Bro.E.'s vagina, resulting in appellate cause number 01-09-00833-CR. Cause number 09CR1189 was for aggravated sexual assault of a child for causing his sexual organ to contact Bri.E.'s mouth, resulting in appellate cause number 01-09-00832-CR. *See* Tex. Penal Code Ann. § 22.021 (Vernon Supp. 2009) (stating elements for offense of aggravated sexual assault of child). For both of these cause numbers, the jury found appellant guilty and assessed a punishment of life in prison and a fine of $10,000.

the time the complainants were two years old, they spent almost every Sunday afternoon with appellant and his wife, Francine Eubanks. In October 2006, the complainants were visiting their aunt, Terri Moore, and playing with some friends in Moore's bedroom. When Moore came into the room, the girls immediately stopped talking in a way that Moore found suspicious, so she asked the girls what they had been talking about. The complainants, who were seven at the time, told Moore that appellant was abusing them. Moore told the complainants' mother, Jamie Eubanks. The complainants' visits with appellant and Francine immediately stopped, and within the next few days, Jamie contacted the police, took the complainants to Texas Children's Hospital, and began the process of seeking counseling for them.

Bro.E. told the doctor who examined her that appellant "hurt me" and that sometimes when he hurt her he "messed with my butt [and] sometimes my private." The doctor testified that Bro.E identified her "private" as her vagina. Bro.E also told the doctor, "He slobbered on my mouth. My stomach and back and neck he slobbered on and face [sic]." When the doctor asked her what appellant did with her butt and private, Bro.E. responded, "He rubbed them with his feet and hands. Sometimes there would be pictures. Sometimes part of my clothes were off. Sometimes my bottoms off and my shirt off. Sometime my underwear ... or sometimes nothing on [sic]." Bro.E. told the doctor that the abuse began when she and Bri.E. started first grade and continued until the last time they had visited appellant.

Bri.E. told the doctor that appellant touched her "in the wrong places ... like in [my] pants and stuff." Bri.E. also testified that appellant took pictures of her and Bro.E. She also told the doctor, "We would try to put our clothes on. We finally told our mother because we were getting scared. We didn't tell her everything because we were embarrassed." The doctor testified that she did not find any abnormalities or signs of trauma during her physical examination of the complainants. However, the doctor also testified that "in the majority of cases ..., approximately 90 percent of the ... evaluations, we don't find any evidence of trauma." She testified that the lack of physical trauma or injuries did not mean that the girls were not telling the truth. She testified that the complainants' descriptions of the abuse and the time that had passed between the last incident and the exam led her to believe that a finding of no physical trauma could still have been consistent with their allegations.

Based on the complainants' interviews with a forensic examiner at the Children's Advocacy Center in Galveston and police interviews with the complainants' mother and aunt, the police obtained a search warrant for appellant's home. Police seized computers, wireless surveillance cameras, and external hard drives. A special agent with the Secret Service, W. Bracas, found 105 images of the complainants on appellant's computer saved under appellant's username in a file entitled "9806 B & B." Appellant also gave a statement in which he denied all of the allegations.[2]

Approximately one month after the complainants made their outcry, they began

---

**2.** Appellant made a motion to suppress the evidence of the computers and any evidence found on the computers, arguing that the search warrant was not supported by probable cause to seize the computers. The trial court denied the motion. We discuss the details of appellant's motion to suppress and the search warrant and supporting affidavit in our analysis of appellant's seventh issue.

receiving counseling from Carol Stephens, a psychotherapist. Stephens testified that it is common for victims of abuse to slowly disclose the details of what happened to them over a period of time, stating, "[The] first outcry is extremely difficult. So it's highly unusual that they are going to immediately disclose everything." Stephens testified that, as child abuse victims begin to feel safer in their environment, "it [makes] it easier for them to open up."

Stephens testified that, as part of her treatment of the complainants, she discussed the abuse with them "a lot." She testified that Bri.E. specifically disclosed to her, in her first private session, that her grandfather "would force her to put his penis in her mouth and put his hand on the back of her head and pull her head down." Bri.E. told Stephens, "I hated it. It tasted terrible and it stunk down there." Bro.E. told Stephens later in their treatment that her grandfather had contacted or touched her vagina with his mouth.

Stephens also testified that in the course of her treatment of the complainants, she had seen a tremendous improvement in their behavior, and that they had gone from having trouble in school and demonstrating excessive anger, feelings of shame and guilt, excessive crying, fear, and nightmares to being "two beautifully thriving 10–year–old girls" who are "normal 10–year–old girls as far as their behavior goes right now." Several family members also testified that the complainants demonstrated problematic behavior prior to their outcry that improved once they were no longer in contact with appellant and were receiving treatment. In particular, the girls' aunt, Terri Moore, testified that the girls had had trouble in school and that she observed them on more than one occasion attempting to touch her son inappropriately, but that after the girls made their outcry, their behavior improved tremen-

dously. The complainants' maternal grandfather, Harvey Moore, also testified that while the complainants lived with him and his wife, from the time the girls were two until they were five or six, the complainants behaved inappropriately on occasion and had some trouble at school. Specifically, he testified,

> I would be holding them and they would touch me [on my penis] and kind of giggle about it. And that happened, I don't know, three or four times. And I kept telling them that that's not appropriate, we don't do that. And it took three or four times to get it across to them not to do that.

The complainants themselves testified at trial. Bro.E. testified that she was assaulted by her grandfather, appellant. She testified that appellant "touched me in bad places," particularly indicating that he touched her breasts, vagina, and anus with his hand and mouth. She also testified that appellant had her touch his nipple, penis, and bottom. Bro.E. also testified that she saw appellant touch her sister, Bri.E., "the same places I had been touched." When the State asked her who would be at appellant's house when the abuse happened, she replied, "Either me, my sister and him or only me and him." She testified that she and Bri.E. would fight about who had to stay with appellant and who got to go to the mall with Francine. She also testified that appellant took pictures of her naked, that it was his idea to take the pictures, that the poses in the pictures were his idea, and that she did not want to take them. She testified that she would wear "a bathing suit cover or nothing or my underwear." She testified that appellant told the girls to "pose" and touch each other in the same places that appellant touched them—their breasts and vaginas. She testified that she never told him not to take the pictures because she was

scared and that appellant told her she "would get in a huge amount of trouble" if she ever told anyone what was happening. Bro.E. testified that since she quit going to appellant's house and started getting counseling, nothing like the abuse has ever happened to her again.

Bri.E. also testified that appellant "messed with her" and that he touched her vagina, breasts, and anus with his hand and foot. She testified that, although appellant was in a wheelchair and could not move his feet, he would tell her to "get at the bottom of the bed and he'd get at the top of the bed" and to move his foot up and down with her hands. Bri.E. also testified that he kissed her on the mouth like "we were getting married." When asked if she had ever had to touch appellant anywhere other than his mouth with her mouth, she said no. She also said that she did not remember ever telling anyone that she had to touch his penis with her mouth. She testified that the last time the abuse happened was three years ago, that the details were a little hard to remember, and that it was harder to remember now than it was in the beginning. Bri.E. testified that she did not tell everybody everything that happened in the beginning because she was scared of getting in trouble. On cross examination, appellant's counsel asked, "Did he ever make you put your mouth on his private," and Bri.E. answered no. Counsel asked a couple of other specific questions, then said, "You're sure that he didn't do those things I just asked you about?" Bri.E. responded, "Yes—I'm not sure. It could have happened, but I just don't remember it." Bri.E. also testified that she told the forensic investigator, Kim Herd, something that was not true—that appellant had handcuffed her—but it had been a long time since she talked to the investigator and did not remember telling Herd that appellant tied her up. Bri.E. also testified that ap-

pellant took pictures of her and of Bro.E, that he told them "how to be" in the pictures, that she would sometimes be wearing nothing or sometimes wearing "some clothes," that appellant would tell her and Bro.E. to touch each other's "privates," and that she sometimes saw appellant do things to Bro.E.

Appellant, his wife Francine, and a urologist testified on appellant's behalf. The urologist testified that appellant had suffered a spinal injury in 1982 that left him wheelchair-bound and without feeling below the bottom of his ribcage. He also testified that at some point, appellant had received a penile implant that allowed him to achieve an erection, but the implant was no longer functional at the time he first examined appellant a few months earlier. The urologist testified that appellant was not able to achieve or maintain an erection or void his bladder on his own and had no feeling below the waist.

Francine testified that she had been married to appellant for 35 years and that he was injured in a car crash in 1982 that resulted in his losing all of the feeling and function below his waist. She testified that he was not capable of sexual relations, had no feeling in that area, and is not able to achieve an erection. She testified that appellant received the implant for her, "for us to have some semblance of normal relations in our marriage." She testified that it only worked for just a few years and had stopped working by 1990. Fran testified that the girls would visit them often on Sundays and that the girls sometimes acted inappropriately. Specifically, she testified that at dinner, "they had one hand on a fork eating the meal and the other hand in their genitals. And we couldn't even finish the meal without—I would have to call them down and say, 'What are you doing ... We're eating and that's inappropriate.... Are you hurt? ... What's go-

ing on.'" She also testified that Bro.E. "grabbed my hand on several occasions and put it in her crotch and said, 'Touch me, Mimi, and make me feel good.'" Francine testified that she never saw them do anything inappropriate with appellant, but that she knew "that [Bri.E.] wanted him to take his clothes off and get in the shower with her." She testified that she and appellant became concerned that the complainants were being sexually abused, and that they talked to Jaime about their concerns regarding the girls' masturbation and sexually acting out, and that the girls told her and appellant they were posing for pictures. Fran testified that Jamie responded by crying and telling them that she did not want anyone to "shame" her kids and that she did not care if her girls masturbated.

Francine testified that she would frequently take one of the girls out to run a quick errand or to go to the mall. The State showed Francine some of the photographs recovered from appellant's computer. She testified that the photos where appellant's feet were included in the picture and one of the girls was sitting on the end of the bed in just her underwear were not inappropriate. Specifically, she stated, "They're posing. They're playing. This is what—this sort of stuff alarmed us. This was what we told Jamie about. This is what they wanted to do." When the State showed her a picture of one of the girls with her top pulled down to expose her breasts that was taken the same day, Francine testified that one of the complainants took the picture, but she stated that she "probably" did not see them taking those pictures. When she was shown a picture of the two complainants lying on a bed wearing only white bikini underwear and bunny ears, with one girl kissing the pubic area of the other girl on top of the underwear, Francine testified that the picture was inappropriate and that it was taken by the complainants' father, her son. Francine testified that she told Detective Grant that her son took inappropriate photos of the girls, but, in rebuttal testimony, Detective Grant testified that Francine never mentioned that her son took photos of the girls.

Appellant also testified that he had suffered a spinal injury in 1982 and repeated Francine's testimony that the implant only worked for a few years, that he did not have any feeling from his waist to his toes, and that they did not have sexual relations. He also testified that he and Francine would see the complainants on most Sundays. He testified that he once woke up to realize that Bro.E. had her hand in his pants, and that sometimes when they were showering after being in the spa, the girls would try to pull his swimming trunks off. He also testified that he and Francine became concerned that the complainants were being abused and that the girls told him and Francine that they "do this" with their other grandfather and their mother's boyfriend and "every other male in the family."

When asked about who took the pictures, appellant responded, "there were three adults and two kids in that house all that time. So some were taken by adults and some were taken by the girls. I think the most upsetting pictures were taken by the girls. That's when we decided to go to their mom. But over time they had started how they would—they started to deteriorate. Started wanting to sit with their legs up and they started wanting to pull their little tops down. And, yeah, that was distressing by a 7–year–old." Appellant testified that he tried to show the pictures to Jamie, but she did not want to see them and told him and Francine that she was aware of the complainants' behavior. He testified that he and Francine thought that the girls began acting out around the time

their father was not coming to see them like he promised and there was a lot of turmoil with their mom and her boyfriend breaking up. Appellant also testified that his son took one of the photographs, State's exhibit 1, and when the State pointed out that the file had been created after the time that appellant stated his son had moved out of the house, appellant only answered that he thought those dates were subject to change. Appellant admitted that he never told the detective that his son took any photographs, but he also stated that, at the time he talked to Detective Grant, he did not know what pictures were being talked about. In rebuttal testimony, Jamie denied that Francine and appellant had tried to show her inappropriate pictures during their talk a couple of weeks before the girls made their outcry.

All eight charges were submitted to the jury without any objection to the charges by appellant, and the jury convicted him on all eight offenses. This appeal followed.

### Legal and Factual Sufficiency

In his first four issues, appellant contests the legal and factual sufficiency of the evidence against him.

### A. Standard of Review

When an appellant challenges both the legal and factual sufficiency of the evidence, we must first determine whether the evidence was legally sufficient to support the verdict. *Harmond v. State*, 960 S.W.2d 404, 406 (Tex.App.-Houston [1st Dist.] 1998, no pet.). We review the legal sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *King v. State*, 29 S.W.3d 556, 562 (Tex.Crim.App.2000). Although our analy-sis considers all the evidence presented at trial, we may not re-weigh the evidence and substitute our judgment for that of the fact finder. *Id.*

Factual sufficiency analysis is broken down into two prongs. First, we must ask whether the evidence introduced to support the verdict, although legally sufficient, is so weak that the jury's verdict seems clearly wrong and manifestly unjust. *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex.Crim.App.2006) (quoting *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App.2000)). Second, we must ask whether, considering the conflicting evidence, the jury's verdict, although legally sufficient, is nevertheless against the great weight and preponderance of the evidence. *Id.* at 415. In conducting this review, we view all of the evidence in a neutral light. *Id.* at 414. We are also mindful that a jury has already passed on the facts and that we cannot order a new trial simply because we disagree with the verdict. *Id.* What weight to give contradictory testimonial evidence is within the sole province of the jury because it turns on an evaluation of credibility and demeanor. *Cain v. State*, 958 S.W.2d 404, 408–09 (Tex.Crim.App.1997). Therefore, we must defer appropriately to the fact finder and avoid substituting our judgment for its judgment, and we may find evidence factually insufficient only when necessary to prevent manifest injustice. *Id.* at 407; *see also Johnson*, 23 S.W.3d at 12.

### B. Sufficiency of the Evidence of Aggravated Sexual Assault of Bri.E.

In his first two issues, appellant argues that the evidence is legally and factually insufficient to establish that Bri.E.'s mouth contacted appellant's penis.

The indictment for aggravated sexual assault of Bri.E. alleged that appellant

caused his penis to contact and penetrate Bri.E.'s mouth. Thus, the State was required to prove beyond a reasonable doubt that appellant intentionally or knowingly caused the penetration of the mouth of a child younger than 14 years of age by his sexual organ or that he caused the mouth of a child to contact his sexual organ. *See* TEX. PENAL CODE ANN. § 22.021 (Vernon Supp. 2009).

■ Here, Stephens testified that Bri.E. specifically disclosed, in her first private session, that her grandfather "would force her to put his penis in her mouth and put his hand on the back of her head and pull her head down." Bri.E. told Stephens, "I hated it. It tasted terrible and it stunk down there." Outcry testimony alone can be legally sufficient evidence to support a conviction. *Rodriguez v. State,* 819 S.W.2d 871, 873 (Tex.Crim.App.1991). There is no requirement that outcry testimony admitted as substantive evidence be corroborated or substantiated by the victim or independent evidence. *Id.* at 874.

Appellant argues that this evidence is legally insufficient because Stephens did not specify whether the "grandfather" causing the contact was appellant or her maternal grandparent, Harvey Moore. Appellant argues that Moore also had "sexual contact" with the complainants because Moore testified that the complainants touched his penis several times while they were living with him and his wife. However, appellant's argument takes the evidence and testimony out of context. Stephens testified that she was treating the complainants for emotional and behavioral issues arising from their outcry of abuse committed by appellant. The complainants never made any outcry of abuse committed by any other person, nor did any witness at trial testify about any abuse committed by any other person. Furthermore, Moore's testimony was made in the context of demonstrating the complainants' emotional and behavioral state prior to their outcry and contrasting that with their improved emotional and behavioral state after visits with appellant were suspended and they began receiving treatment.

Thus, viewing the evidence in the light most favorable to the judgment and giving due deference to the fact finder, we hold that the evidence was legally sufficient for a rational fact finder to have found beyond a reasonable doubt that appellant caused his penis to contact Bri.E.'s mouth. *See King,* 29 S.W.3d at 562; *Rodriguez,* 819 S.W.2d at 874.

■ Appellant also argues that the evidence is factually insufficient because Bri.E. testified at trial that appellant did not ever make her contact his penis with her mouth. However, as we have already discussed, there is no requirement that outcry testimony admitted as substantive evidence be corroborated or substantiated by the victim or by independent evidence. *Rodriguez,* 819 S.W.2d. at 874; *see also Saldana v. State,* 287 S.W.3d 43, 60 (Tex. App.-Corpus Christi 2008, pet. ref'd) (holding that outcry witness's testimony was sufficient to support conviction for aggravated sexual assault notwithstanding complainant's inconsistent testimony at trial).

■ Furthermore, "[w]hen a witness recants prior testimony, it is up to the fact finder to determine whether to believe the original statement or the recantation," and "[a] fact finder is fully entitled to disbelieve a witness's recantation." *Saldana,* 287 S.W.3d at 60 (citing *Chambers v. State,* 805 S.W.2d 459, 461 (Tex.Crim.App.1991)); *see also Cain,* 958 S.W.2d at 408–09 (holding that jury was sole judge of weight to give contradictory testimonial evidence). Bri.E. testified that the details of appellant's abuse of her were harder to remem-

ber now than they were three years earlier when she made the outcry, and when asked specifically if she was sure that appellant had not made her contact his penis with her mouth, she stated that she was not sure and "[i]t could have happened, but I just don't remember it."

Considering all of the evidence in a neutral light, we cannot conclude that the evidence was so weak that the jury's verdict seems clearly wrong and manifestly unjust, nor was the jury's verdict against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 414–15. Thus, we hold that the evidence was factually sufficient to support appellant's conviction for aggravated sexual assault of Bri.E.

We overrule appellant's first and second issues.

### C. Legal Sufficiency of Sexual Performance by a Child and Possession of Child Pornography

In his third and fourth issues, appellant argues that the evidence is legally insufficient to establish that he produced a sexual performance that included sexual conduct by a child and that he possessed child pornography. Specifically he argues that the photos that he was alleged to have produced and possessed were of the "girls' undeveloped chests" and "did not depict 'breasts'" for purposes of the sexual performance by a child and possession of child pornography statutes.

A person commits the offense of sexual performance by a child if "knowing the character and content of the material, he produces, directs, or promotes a performance that includes sexual conduct by a child younger than 18 years of age." Tex. Penal Code Ann. § 43.25(d) (Vernon Supp. 2009). The Penal Code defines "sexual conduct" to include "lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." *Id.* § 43.25(a)(2). Similarly, a person commits the offense of possession of child pornography if he "knowingly or intentionally possesses visual material that visually depicts a child younger than 18 years of age at the time the image of the child was made who is engaging in sexual conduct [and] the person knows that the material depicts the child as described [above]." Tex. Penal Code Ann. § 43.26(a) (Vernon 2003). Section 43.26 provides that "'sexual conduct' has the meaning assigned by Section 43.25." *Id.* § 43.26(b)(2).

Neither of these statutes require that the child's breasts be "developed," and the definition of "sexual conduct" as applies to both offenses specifically contemplates that a "lewd exhibition of . . . any portion of the female breast below the top of the areola" is sufficient to constitute "sexual conduct" as required for the offenses of sexual performance by a child and possession of child pornography. *See id.* § 43.25(a)(2). The evidence presented at trial included both complainants' testimony that appellant forced them to pose for pictures that they did not want to take and that appellant told them to pose in ways that exposed their breasts below the areola, genitals, and anus and that showed them engaged in sexual contact with each other.[3] Additionally, the State introduced

---

**3.** We note that appellant's indictments for sexual performance by a child did not specify that the "sexual conduct" was lewd exhibition of the female breast below the areola. Thus, the State could meet its burden to prove that the performance by either complainant included "sexual conduct" by proving the acts listed in the definition of sexual conduct, which includes, among other things, sexual contact, masturbation, and lewd exhibition of the genitals, anus, or any portion of the female breast below the top of the areola. *See* Tex. Penal Code Ann. § 43.25(a)(2).

multiple photographs with lewd exhibitions of the complainants' breasts below the top of the areola, their genitals, and anuses and that demonstrated them engaging in sexual contact with each other. Thus, we conclude that the evidence was legally sufficient to support appellant's conviction for both sexual performance by a child and possession of child pornography.

We overrule appellant's third and fourth issues.

## Double Jeopardy

In his fifth and sixth issues, appellant argues that his constitutional protection against facing double jeopardy was violated.

### A. Standard of Review

Appellant never objected to the charge at trial or asserted any double jeopardy complaint prior to this appeal. However, a double jeopardy claim can be raised for the first time on appeal if the undisputed facts make the double jeopardy violation apparent from the record. *See Gonzalez v. State,* 8 S.W.3d 640, 643 (Tex. Crim.App.2000). Specifically, a defendant may raise a double jeopardy claim for the first time on appeal when (1) no further proceedings are required to "expand the record with new evidence" and the claim can be resolved "on the basis of the existing record"; and (2) "enforcement of the usual rules of procedural default serves no legitimate state interest." *Id.* at 643–44 (citing *United States v. Broce,* 488 U.S. 563, 575, 109 S.Ct. 757, 765–66, 102 L.Ed.2d 927 (1989) and *Menna v. New York,* 423 U.S. 61, 63, 96 S.Ct. 241, 242, 46 L.Ed.2d 195 (1975)); *see also Langs v. State,* 183 S.W.3d 680, 687 (Tex.Crim.App. 2006) ("[A] potential multiple-punishment double jeopardy claim may be forfeited if a defendant does not properly preserve that claim.") (citing *Gonzalez,* 8 S.W.3d at 642–

43). Therefore, we must first determine whether appellant's double jeopardy complaint can be resolved on the basis of the existing record and is, therefore, preserved.

Double jeopardy is the principle that a person shall not be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend V. These prohibitions protect against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense. *Ex parte Herron,* 790 S.W.2d 623, 624 (Tex. Crim.App.1990). When a defendant is subjected to a single trial only, the protection against multiple punishments is applicable. *See id.*

A double jeopardy claim of multiple punishments for the same offense can arise in two contexts: (1) when a greater offense also meets the elements of a lesser-included offense, and the same conduct is punished twice; and (2) when the same criminal act is punished under two distinct statutes when the legislature intended the conduct to be punished only once. *Langs,* 183 S.W.3d at 685. For double jeopardy purposes, "[t]he same offense means the identical criminal act, not the same offense by name." *Luna v. State,* 493 S.W.2d 854, 855 (Tex.Crim.App. 1973) (stating that if indictments do not determine whether offenses prosecuted are same, this court will look to proof offered at trial).

Sameness in this context is "purely a matter of legislative intent," and the "traditional indicium of that legislative intent is the so-called 'same element' test of *Blockburger v. United States.*" *Gonzales v. State,* 304 S.W.3d 838, 845 (Tex.Crim. App.2010) (citing *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed.

306 (1932)). "According to that test, it should be presumed that the Legislature did not regard two statutorily defined offenses to be the same so long as 'each provision requires proof of a fact which the other does not.'" *Id.* (quoting *Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182). The Texas Court of Criminal Appeals has also "recognized that '[t]he *Blockburger* test's status as a mere rule of statutory construction raises an inverse conclusion as well: the Blockburger test cannot authorize two punishments where the legislature clearly intended only one.'" *Id.* (quoting *Ex parte Ervin*, 991 S.W.2d 804, 807 (Tex. Crim.App.1999)). The court stated:

> Thus, even if a straightforward application of the Blockburger test would suggest that two offenses are not the "same" for double-jeopardy purposes, if other indicia manifest a legislative intent that an accused not be punished for both offenses if they occur in the course of a single transaction, then an accused may not be punished for both offenses. *Ervin* provided a non-exclusive catalog of considerations to help courts determine legislative intent in this context: whether the offenses['] provisions are contained within the same statutory section, whether the offenses are phrased in the alternative, whether the offenses are named similarly, whether the offenses have common punishment ranges, whether the offenses have a common focus (i.e. whether the "gravamen" of the offense is the same) and whether that common focus tends to indicate a single instance of conduct, ... and whether there is legislative history containing an articulation of an intent to treat the offenses as the same or different for double jeopardy purposes.

*Id.* at 845–46 (quoting *Ervin*, 991 S.W.2d at 814).

## B. Sexual Performance by a Child and Possession of Child Pornography

■ In his fifth issue, appellant argues that double jeopardy prevents him from being punished for both producing and possessing pornographic photos of a child. Appellant's first indictment for sexual performance by a child alleged that appellant "did ... intentionally or knowingly produce a performance, to-wit: a photograph that included sexual conduct by [Bri.E.], a child younger than 18 years of age, and the defendant knew the character and content of the material." Appellant's second indictment for sexual performance by a child made identical allegations regarding Bro.E. Appellant's indictments for possession of child pornography alleged that appellant "did ... intentionally or knowingly possess visual material that visually depicted, and which the defendant knew visually depicted a child who was younger than 18 years of age at the time the image of the child was made, engaging in sexual conduct, to-wit: actual lewd exhibition of female breast below the top of the areola." Appellant argues that "[t]he allegation that appellant produced photos that included sexual conduct by the girls necessarily included the allegation that he possessed the photographs. Thus, possession of child pornography is a lesser included offense of sexual performance by a child as alleged in the respective indictments."

In determining whether a double jeopardy violation is apparent on the face of the record, we first examine appellant's claim that possession of child pornography is a lesser included offense of sexual performance of a child as alleged in the indictments against him and thus constituted the same offense. As we have already discussed, a person commits the offense of sexual performance by a child if, "knowing the character and content of the material, he produces, directs, or promotes a per-

formance that includes sexual conduct by a child younger than 18 years of age." TEX. PENAL CODE ANN. § 43.25(d). Sexual conduct is defined as "sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." *Id.* § 43.25(a)(2). Sexual performance is defined as "any performance or part thereof that includes sexual conduct by a child younger than 18 years of age." *Id.* § 43.25(a)(1). Performance is defined as "any play, motion picture, photograph, dance, or other visual representation that can be exhibited before an audience of one or more persons." *Id.* § 43.25(a)(3).

A person commits the offense of possession of child pornography if he "knowingly or intentionally possesses visual material that visually depicts a child younger than 18 years of age at the time the image of the child was made who is engaging in sexual conduct [and] the person knows that the material depicts the child as described [above]." TEX. PENAL CODE ANN. § 43.26(a). Thus, the statutes require two different acts. Section 43.25 requires that the actor engage in specific conduct—that he employ, authorize, or induce a child to engage in sexual conduct or a sexual performance. *See id.* § 43.25. It does not require that appellant still possess the "performance" that he produced. *See id.* § 43.25(a)(3), (4) (defining "performance" and "produce"). Section 43.26, on the other hand, requires possession of visual material that visually depicts a child who is engaging in sexual conduct. *See id.* § 43.26. We conclude that each provision requires proof of a fact that the other does not and thus, sexual performance by a child and possession of child pornography are not the same offense for double jeopar-

dy purposes. *See Gonzales,* 304 S.W.3d at 845.

Thus, application of the *Blockburger* test in this case establishes the presumption that the Legislature did not regard the two statutorily defined offenses of sexual performance by a child and possession of child pornography to be the same. *See Gonzales,* 304 S.W.3d at 845. Appellant does not point to any "other indicia" that would "manifest a legislative intent that an accused not be punished for both offenses if they occur in the course of a single transaction," nor do we find any. *See id.* at 845–46 (quoting *Ervin,* 991 S.W.2d at 814). Furthermore, we note this is not a situation where appellant is being punished multiple times for the same criminal act. The State admitted 104 photographs into evidence that could have been considered for purposes of either offense, and it also admitted the testimony of both complainants establishing that appellant induced them into sexual performances by making them pose for lewd photographs. For double jeopardy purposes, possession of each image of child pornography constitutes an allowable unit of prosecution. *See Vineyard v. State,* 958 S.W.2d 834, 837–38 (Tex.Crim.App.1998) (noting that legislature's use of singular term "film image" in statute indicated, for double jeopardy purposes, that that possession of each film image of child pornography constituted allowable unit of prosecution). Considering the similar wording of the sexual performance of child statute, we conclude that each instance in which an actor employs, authorizes, or induces a child to engage in sexual conduct or a sexual performance is an allowable unit of prosecution. *See* TEX. PENAL CODE ANN. § 43.25(a), (b) (using singular "sexual performance," defined as any "play, motion picture, photograph, dance, or other visual representation that can be exhibited before an audience of one or

more persons" in stating elements of sexual performance by child).[4]

We overrule appellant's fifth issue.

## C. Separate Indictments of Possession of Child Pornography

In his sixth issue, appellant argues that double jeopardy prevented him from being found guilty of two counts of possession of child pornography when the indictments did not allege that he possessed different photos.

Here, the State's pleadings do not make it clear exactly which of the 104 photographs entered into evidence formed the basis of each offense. Thus, we may look at the evidence presented. *See Luna*, 493 S.W.2d at 855. The State specifically recommended that the jury examine exhibits one and three, both of which contained a lewd exhibition of the female breast below the areola, to determine if appellant was guilty of possession of child pornography. The State introduced at least 28 additional photographs that exhibited the complainants' breasts below the areola. Thus, the evidence introduced at trial clearly demonstrates that appellant's two counts for possession of child pornography were based on separate photographs. *See id.; see also Vineyard*, 958 S.W.2d at 837–38 (holding that, for double jeopardy purposes, possession of each image of child pornography constitutes allowable unit of prosecution).

We overrule appellant's sixth issue.

4. We also note that sexual performance by a child is a conduct-oriented offense in which the legislature criminalized very specific conduct. *Cf. Vick v. State*, 991 S.W.2d 830, 832–33 (Tex.Crim.App.1999) (holding that aggravated sexual assault of a child statute "is a conduct-oriented offense in which the legislature criminalized very specific conduct of several different types"). Thus, each victim also constitutes an allowable unit of prosecution.

## Motion to Suppress

In his seventh issue, appellant argues that the trial court erred in denying his motion to suppress and admitting evidence obtained from the computers taken from his home because the affidavit supporting the search warrant did not state probable cause to justify the seizure of the computers.

## A. Facts Regarding Probable Cause Affidavit and Search Warrant

The search warrant was issued pursuant to an affidavit by Detective Grant asserting that he believed appellant "has possession of and is concealing at said suspected place ... pictures [and] photographs of the victims or other victims [including] all pictures of photos that depict a child younger than 18 years of age engaged in sexual conduct." Detective Grant also averred in his affidavit that property consisting of "all video and DVD recording material," "all computer hardware and software," and "all camera related equipment both digital [and] film" that could be used in depicting children younger than 18 years of age engaged in sexual conduct constituted evidence of the alleged offense. Detective Grant stated that he had probable cause for these beliefs because in the course of his interview with the complainants' mother Jamie, she

advised that she spoke to her sister, Terry Moore who told her that she overheard her two daughters talking about someone touching them.... When she

*See Ex parte Gonzalez*, 147 S.W.3d 474, 477 (Tex.App.-San Antonio 2004, pet. ref'd) ("With conduct-oriented statutes, each victim is the allowable unit of prosecution."). Here, we conclude that a single instance of production of a sexual performance—i.e., production of one photographic performance—that involves more than one child—i.e., where both complainants posed together—could result in more than one offense. *See id.*

questioned [the complainants'] about this both girls became very defensive and said that Grand-pa, meaning Donald Eubanks, said they would get in trouble if they told anyone what happened.

Detective Grant averred that he also interviewed Moore, who told him that the complainants told her that appellant touched them "in places he shouldn't." Detective Grant also related in the probable cause section of his affidavit disclosures made by the complainants during their interview with Kim Herd at the Child Advocacy Center in Galveston. Both girls told Herd that appellant would touch their "privates" and made them pose for pictures in which they were sometimes partially or totally nude. Detective Grant further averred that Bri.E. "said that she saw [appellant] put the pictures under his bed or in the closet in his bedroom."

Detective Grant averred that he "talked with League City evidence officer Thomas Garland and he advised that on a digital camera, even if the image has been deleted, if it was saved to the sim card or hard drive, then the deleted image would be recoverable." Detective Grant concluded his statement of probable cause by averring:

> Your affiant believes that the foregoing facts establish probable cause that the offenses of sexual assault were committed on or before October 11th, 2006, in Galveston County, Texas; that pictures, video and DVD's, computers and related computer equipment and storage devices, cameras and video recording devices if found in the premises described above, constitute[ ] evidence of said offense; and that the evidence to be searched for is likely to be located in said premises.

The judge of the 56th District Court of Galveston County issued the search warrant, stating, "I find that the verified facts stated by Affiant in said Affidavit show that Affiant has probable cause for the issuance of this Warrant." The search warrant authorized officers to "search for the property described in said Affidavit, to-wit: Pictures, photos, videos and DVD's, rope or other binding material, all computer related equipment including storage devices, cameras and video recording devices."

## B.  Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *McKissick v. State,* 209 S.W.3d 205, 211 (Tex.App.-Houston [1st Dist.] 2006, pet. ref'd). We give almost total deference to the trial court's determination of historical facts that depend on credibility, while we review de novo the trial court's application of the law to those facts. *Id.* Thus, we review de novo the trial court's application of the law of search and seizure and probable cause. *Id.* However, our review of an affidavit in support of a search warrant is not de novo; rather, great deference is given to the magistrate's determination of probable cause. *Id.*

No search warrant may issue unless supported by an affidavit setting forth substantial facts establishing probable cause for its issuance. TEX.CODE CRIM. PROC. ANN. arts. 1.06, 18.01(b) (Vernon 2005 & Supp. 2009). The issuance of a search warrant for "items" requires that the peace officer first present to a magistrate a sworn affidavit setting forth sufficient facts to establish probable cause that (1) a specific offense has been committed; (2) the specifically described property or items to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense; and (3) the property or items constituting such evidence are located at or on the particular person, place, or thing

to be searched. Tex.Code Crim. Proc. Ann. arts. 18.01(c), 18.02(10) (Vernon 2005).

▉▉▉▉ "The test for determination of probable cause is whether the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing." *McKissick,* 209 S.W.3d at 211 (citing *Illinois v. Gates,* 462 U.S. 213, 236–37, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983)). Probable cause exists when, under the totality of the circumstances, the facts submitted to the magistrate are sufficient to justify a conclusion that the object of the search is probably on the premises to be searched at the time the warrant is issued. *Id.* A reviewing court may consider only the facts found within the four corners of the affidavit when evaluating a complaint that a search warrant affidavit does not establish probable cause. *Id.* at 212. Reasonable inferences may be drawn from the affidavit, and the affidavit must be interpreted in a common sense and realistic manner. *Id.*

## C. Analysis

▉▉▉ Here, appellant contends that the affidavit for the search warrant did not state probable cause to justify the seizure of the computers because the affidavit "afforded no basis for the magistrate to conclude that appellant even had a computer at home, much less that he took pornographic photos of the girls with a digital camera and transferred them onto a computer." Appellant points out that neither complainant "mentioned a computer or a digital camera" and that Bri.E. stated that she "saw him 'put the pictures under his bed or in the closet in his bedroom.'"

However, the affidavit (1) alleged that "the offenses of sexual assault were committed"; (2) specifically described "pictures, video and DVDs, computers and related computer equipment and storage devices, cameras and video recording de-

vices" as property or items to be searched for or seized that constituted evidence of that offense or evidence that appellant committed that offense; and (3) stated that the property or items constituting such evidence are "likely to be located in said premises." *See* Tex.Code Crim. Proc. Ann. arts. 18.01(c), 18.02(10). The affidavit was supported by the complainants' allegations that appellant touched them inappropriately and that they posed for inappropriate photographs. Although neither complainant specifically mentioned the use of a digital camera or a computer, it was reasonable for the magistrate to infer from the information in the affidavit that the complainants were photographed and that a digital camera and computer could have been used in the process of taking inappropriate photographs of the girls and could probably be found on the premises to be searched. *See McKissick,* 209 S.W.3d at 211–12 (holding that reasonable inferences may be drawn from affidavit, and affidavit must be interpreted in common sense and realistic manner). Furthermore, all of the information in the affidavit indicated that all of the assaults and pictures of the girls engaged in sexual conduct were taken at appellant's residence and that Bri.E. saw appellant hide some of the pictures in his bedroom. Thus, it was likewise reasonable for the magistrate to conclude that any items like photographs, computer equipment, or cameras used in the commission of the offenses was located in appellant's home. *See, e.g., State v. Barnett,* 788 S.W.2d 572, 576 (Tex.Crim.App.1990) ("Once the probable cause has been established and the object of the search particularly described, the scope of the search 'generally extends to the entire area in which the object of the search may be found.'") (quoting *United States v. Ross,* 456 U.S.

798, 820, 102 S.Ct. 2157, 2170, 72 L.Ed.2d 572, —— (1982)).

Thus, considering the facts contained in the four corners of the affidavit and the reasonable inferences therefrom in the totality of the circumstances, we conclude that the magistrate had a "substantial basis for concluding that a search would uncover evidence of wrongdoing" and that the facts submitted to the magistrate were sufficient to justify a conclusion that the objects of the search were probably on the premises to be searched at the time the warrant is issued. *See McKissick*, 209 S.W.3d at 212.

We overrule appellant's seventh issue.

### Conclusion

We affirm the judgment of the trial court.