**Opinion issued December 12, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NOS. 01-18-00520-CR, 01-18-00521-CR, 01-18-00522-CR

————————————

**BENSON DORSEY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 185th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1569925, 1570348, 1570349**

---

## O P I N I O N

A grand jury indicted Benson Dorsey for possession of a controlled substance, methadone, with intent to deliver and two violations of the statute barring felons from possessing firearms. *See* TEX. HEALTH & SAFETY CODE §§ 481.102(4), 481.112(a); TEX. PENAL CODE § 46.04(a). After the trial court denied Dorsey's

motion to suppress certain evidence, Dorsey pleaded guilty to all three charges. On appeal, Dorsey contends that the trial court erred in denying his motion to suppress and that his conviction and punishment for two separate felon-in-possession-of-firearm offenses violates his constitutional guarantee against double jeopardy.

We affirm.

## BACKGROUND

This case arises from a rush-hour freeway shooting on the morning of November 6, 2017. The driver of a pick-up truck became irate when another driver tried to prevent him from maneuvering around traffic on the righthand shoulder and responded by firing a handgun at the other driver's vehicle. Law enforcement officers later identified the shooter as Dorsey, a felon twice over. A subsequent search of Dorsey's residence turned up methadone and several firearms.

A grand jury issued three separate indictments against Dorsey. The first indictment alleged that Dorsey possessed a controlled substance, methadone, with intent to deliver. *See* TEX. HEALTH & SAFETY CODE §§ 481.102(4), 481.112(a). The second one alleged that Dorsey, a felon, possessed a firearm before the fifth anniversary of his release from supervision under parole. *See* TEX. PENAL CODE § 46.04(a)(1). For purposes of this indictment, the State relied on Dorsey's 2012 felony conviction for possession with intent to deliver a controlled substance and possession of multiple firearms in his home. Dorsey was not scheduled to be released

from supervision under parole for the drug conviction until 2018. The third alleged that he possessed a firearm at a location other than his residence after having been convicted of a felony. *See id.* § 46.04(a)(2). For purposes of this indictment, the State relied on Dorsey's 2001 felony conviction for possession of a controlled substance and possession of multiple firearms in his home.

Dorsey filed a pretrial motion to suppress the evidence against him. He contended that the eyewitness identification procedure used by law enforcement violated his due process rights by being impermissibly suggestive. Because this identification was the lone basis for probable cause to search his residence, Dorsey argued, the trial court was obligated to suppress the evidence obtained in the search.

The trial court held an evidentiary hearing on Dorsey's motion to suppress. Several witnesses testified at the hearing, including Jennifer Burch, the complaining witness who identified Dorsey as the shooter; responding officers K. Martinez and D. Davila; their supervisor, Sergeant R. Houghton; and Dorsey himself.

Burch testified that as she drove to work one morning in rush-hour traffic on I-10, a white pick-up truck to her rear moved onto the shoulder to pass other motorists. The truck was unable to maneuver around her. She then heard "what sounded like a rock hitting" her car followed by "several more pops." Burch looked in her rearview mirror, saw that the driver of the truck had a gun, and realized he

was shooting her car. In total, she heard around eight to eleven distinct gunshots. The truck then managed to pull around her and sped off past the surrounding traffic.

The truck was a Ford F250 with a red car-dealership sticker on it. Burch clearly saw the driver as the truck passed her. She then telephoned for emergency assistance. Burch provided the truck's license plate number. In her testimony, she described the driver as a black man wearing a white tee-shirt. He was "a thinner male" with "a short, cleanly cut hairline." Burch did not provide all of these details about the driver to the emergency assistance operator, stating at that time only that he was a black man. As Burch was talking to the emergency assistance operator, the truck came back into view as her lane of traffic progressed. But the truck's driver's side window was now up and it was tinted so that she could not see much inside beyond the outline of his body and that "he was trying to say something" to her "in a very aggressive fashion."

An officer with the Houston Police Department telephoned Burch later that morning and asked her to meet with police to identify the shooter. The officer told her that unless she could identify the shooter, charges would not be brought against him. She met officers at a gas station, where they showed her two men, and she identified Dorsey as the shooter. She also identified Dorsey as the shooter in open court.

4

Officers K. Martinez and D. Davila were on patrol together in the same patrol car that morning. They both testified that dispatch radioed about the incident, describing the shooter's vehicle as a white Ford F250 and providing its license-plate number. Martinez and Davila encountered a truck matching that general description—a white Ford F250—a couple of blocks away from an I-10 offramp. They could not read its plate number or see who was inside because the truck was too far ahead of them, so they followed the truck and tried to catch up to it. After the truck turned a corner, they lost sight of it for a couple of minutes but then found it parked in a nearby residential driveway. When Martinez and Davila initially drove by the residence, no one was in the truck, but two black men were standing in the front doorway of the house or out in front of it. Martinez and Davila confirmed by plate number that the truck in the driveway was the one driven by the freeway shooter, and they learned that the truck was registered to a Jerold Jermane Freeman. By the time Martinez and Davila returned to the residence in their patrol car, the two men had gone inside but could be seen "peeking out the window."

Martinez and Davila called for backup, and when another unit arrived on the scene they approached the house. Martinez went to the front door with one of the officers who responded to the request for backup, while Davila went to the back of the house. As Martinez approached, the two men who had previously stood in the doorway came outside through the front door; one of these men was Dorsey, who

5

was wearing a white tee-shirt. The other man wore a black tee-shirt. When questioned, Dorsey said that the truck belonged to his nephew, Freeman. [Dorsey said that he had not seen his nephew that morning. In the process of questioning Dorsey, Martinez ran his name and discovered that an arrest warrant had been issued for Dorsey based on a parole violation. Martinez asked for consent to search Dorsey's home, but Dorsey refused.

When Sergeant Houghton arrived at the scene, Martinez and Davila had detained Dorsey and the second man at the house. Houghton, Martinez, and Davila determined that they would need to obtain a warrant to search Dorsey's home, and that to do so they would need Burch to identify Dorsey as the shooter. Houghton telephoned Burch to arrange an identification and told her that the district attorney would not charge Dorsey for the shooting unless she positively identified him as the shooter. Houghton testified that he told Burch this so she would understand he needed her help. Houghton disagreed that saying so was suggestive, or that the identification procedure used by officers violated departmental rules. Though Houghton conceded that other identification methods, like line-ups or photograph arrays, are preferred, he testified that the gas-station show-up procedure used by officers in this instance made sense due to the danger posed to the public by the freeway shooter and the likelihood that any evidence would be disposed of absent a timely search. Houghton also testified that the surrounding circumstances indicated

6

that either Dorsey or the other man at his house was the driver of the white pick-up truck and the shooter, because these men were the only people present at the home and the events unfolded "very quickly"—that is, Martinez and Davila soon encountered the same truck not far from the freeway and then found it parked in Dorsey's driveway shortly afterward.

After Burch positively identified Dorsey as the shooter, Martinez and Davila went to the district attorney's office to complete an application for a search warrant. Officer Davila made the necessary supporting affidavit. Davila swore that he had reason to believe that there was evidence of a crime in the truck and Dorsey's home, including but not limited to evidence that a felon had a firearm. In summary, Davila stated in the affidavit that he and Martinez:

- received notice from dispatch that a black man in a white tee-shirt driving a white Ford F250, license plate number JXP5507, had shot at another car;

- subsequently encountered a truck matching this general description on a nearby road but lost sight of the truck while following it;

- found the same truck parked in the driveway of Dorsey's home and verified the plate number was the same one relayed by dispatch;

- detained at this location Dorsey, a black man dressed in a white tee-shirt, whom the complainant later identified as the freeway shooter; and

- determined that Dorsey was a felon by reviewing his criminal history and believed that he was illegally in possession of a firearm.

Based on the affidavit, a judge signed a warrant for the search of the truck and Dorsey's home. In the subsequent search of Dorsey's home, law enforcement

7

officers found five bottles containing the prescription drug methadone. Officers also found several loaded firearms, including two revolvers, two semi-automatic pistols, and a shotgun. Officers did not find the keys to the truck and they did not find any contraband in the truck when they searched it.

Dorsey testified that he was at his house that morning, waiting for his landlord to come collect the rent. He stated that he did not leave the house at any point that morning. Dorsey said that he did not see his nephew, Freeman, drop off the pick-up truck at his house, but that Freeman did so some time after seven in the morning. Dorsey saw or heard the truck pull into his driveway, but when he went outside to see who it was he did not see Freeman. Dorsey did see a police cruiser drive by shortly afterward, within a couple of minutes of the truck's arrival.

When police officers came to his door, Dorsey went out and spoke with them. He told them that the truck belonged to Freeman, who worked at a nearby construction site and parked his truck across the street several days each week. Dorsey told the officers that he assumed that was how the truck ended up in his driveway. He said that he'd never been in the truck, let alone driven it. He denied that he was the freeway shooter.

The trial court denied Dorsey's motion to suppress. Dorsey then pleaded guilty to the three offenses for which the grand jury indicted him. The trial court assessed his punishment at 25 years' confinement for the drug offense. It assessed

his punishment at 20 and 25 years' confinement respectively for the two firearms offenses. The trial court ordered these three sentences to run concurrently.

## DISCUSSION

### I.  Motion to Suppress

Dorsey contends that the trial court erred in denying his motion to suppress the evidence law enforcement officers found in the search of his home. He argues that Burch's identification of him as the shooter was the sole basis for probable cause underlying the search warrant and that the identification procedure used by the officers was impermissibly suggestive in violation of his right to due process. When the tainted identification is stricken from the affidavit, Dorsey posits, there was no probable cause for the issuance of the search warrant, making the search illegal.

### A.  Standard of review and applicable law

In general, we apply a bifurcated standard of review to a trial court's decision on a motion to suppress; we give almost total deference to the historical facts found by the trial court and analyze de novo its application of the law. *State v. Cuong Phu Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015). When the trial court has not made explicit findings of historical fact, we view the evidence in the light most favorable to its decision. *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005).

If some of the information in a search-warrant affidavit must be excluded as illegally obtained, we must decide whether the independently acquired and lawful

information contained in the affidavit nonetheless clearly supplies probable cause for the warrant's issuance. *Cuong Phu Le*, 463 S.W.3d at 877. We interpret the remaining information contained in the search-warrant affidavit in a commonsensical and realistic manner, drawing reasonable inferences from this information. *Id.*

Probable cause exists if, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found at a specified location. *Id.* at 878. Probable cause is a flexible, non-demanding standard. *Id.* It requires a relatively high degree of suspicion but far less proof than a preponderance of the evidence. *Baldwin v. State*, 278 S.W.3d 367, 371 (Tex. Crim. App. 2009); *see also Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010).

**B. Analysis**

Dorsey argues (1) Burch's identification of him as the shooter was tainted and (2) without her tainted identification, law enforcement officers lacked probable cause to search his home. Therefore, Dorsey concludes, the trial court erred in denying his motion to suppress the evidence officers obtained in the search. Assuming for the sake of argument but not deciding that Burch's identification was tainted, we disagree that there was not probable cause to search Dorsey's home. Disregarding the identification, the warrant affidavit still shows probable cause.

In the warrant affidavit, Davila stated that he and Martinez received a notice

10

from dispatch about the freeway shooting. This notice informed them of the make and model of the shooter's vehicle, a Ford F250, its color, white, and its license plate number, JXP5507. It also informed them that the shooter was a black man in a white tee-shirt. Davila and Martinez encountered a truck matching the subject's general description and followed it into a neighborhood. They lost sight of the truck, drove around the block, and found it parked in a residential driveway. They confirmed that the truck parked in the driveway had the reported license plate number. At the residence, they spoke with Dorsey, a black man, who lived there. When Martinez investigated whether Dorsey had any criminal history, she found that he had prior felony convictions.

Interpreting this information in a commonsensical fashion, including the reasonable inferences that may be drawn from it, we conclude that the affidavit clearly supplies probable cause for the search warrant for Dorsey's home without Burch's identification of Dorsey, since it supplies a relatively high degree of suspicion that he was a felon unlawfully in possession of a firearm. *Cf. McAllister v. State*, 28 S.W.3d 72, 76 (Tex. App.—Texarkana 2000, no pet.) (search warrant established probable cause to search home based on identification of home owner's vehicle by plate number as vehicle used by perpetrators of robbery).

To the extent that Dorsey contends that the suppression-hearing testimony undermined or contradicted the preceding information from Davila's affidavit, we

disagree. Davila's and Martinez's testimony conformed to the material facts outlined by Davila in the search-warrant affidavit. After hearing their testimony and the testimony of the other witnesses, the trial court concluded that the officers "probably still could have gotten in the house with a warrant" without Burch's identification "based on the evidence they had, and the officers following the truck off the freeway, same license number, and finding it at the house" in a short time-span and finding Dorsey there as well. Viewing the evidence in the light most favorable to the trial court's decision and deferring to its implied findings of historical fact, we hold that the trial court did not err in denying Dorsey's motion to suppress the evidence.

## II. Double Jeopardy

Dorsey contends that two felon-in-possession-of-firearm convictions and the imposition of two separate punishments for them violate his constitutional guarantee against double jeopardy. He argues that the legislature intended that only a single punishment be meted out to a felon who is found to be in possession of several firearms simultaneously. Because Dorsey possessed the five firearms at the same time, he contends that only a single conviction and punishment is permissible.

### A. Waiver

The State contends that Dorsey waived his right to make a double-jeopardy claim by pleading guilty to the two firearm offenses pursuant to a plea bargain and

not raising double jeopardy in the trial court or securing the trial court's permission to appeal based on this issue. Under the circumstances of this case, we disagree.

The constitutional guarantee against double jeopardy is fundamental and therefore may be raised for the first time on appeal, provided that the double-jeopardy violation is apparent on the face of the record and the enforcement of ordinary rules of default do not serve a legitimate state interest. *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000); *Eubanks v. State*, 326 S.W.3d 231, 243 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). A double-jeopardy claim is apparent on the face of the record if its resolution does not require further proceedings to introduce additional supporting evidence. *Ex parte Denton*, 399 S.W.3d 540, 544 (Tex. Crim. App. 2013). The State does not have a legitimate interest in maintaining a conviction if the record clearly shows that it was obtained in violation of the constitutional guarantee against double jeopardy. *Id.*

The State asserts that the rule stated in *Gonzalez* solely applies to instances of procedural default, rather than to cases like this one, in which the defendant pleaded guilty and thus affirmatively waived the right to raise unasserted defenses. *Gonzalez* belies the State's position. In *Gonzalez*, the Court of Criminal Appeals relied in part on *Menna v. New York*, in which the United States Supreme Court held that a guilty plea does not waive the right to assert a double-jeopardy claim on appeal if, judged on its face, the charge is one that the State cannot constitutionally prosecute. 423

13

U.S. 61, 62 (1975) (per curiam); *see Gonzalez*, 8 S.W.3d at 644 (discussing this aspect of *Menna*).

As explained in *Menna*, the reason that a guilty plea ordinarily bars the assertion of previously unasserted constitutional defenses on appeal is that the plea "validly removes the issue of factual guilt from the case" and factual guilt generally is a sufficient basis for the imposition of punishment. 423 U.S. at 62 n.2. A guilty plea thus "renders irrelevant those constitutional violations not logically inconsistent with the valid establishment of factual guilt and which do not stand in the way of conviction if factual guilt is validly established." *Id.* But when it is clear on the face of the record that a conviction or punishment is arguably barred by double jeopardy regardless of the defendant's factual guilt, a guilty plea does not bar the double-jeopardy claim on appeal. *See id.*; *see also United States v. Broce*, 488 U.S. 563, 576 (1989) (double-jeopardy claims are cognizable for first time on appeal despite guilty plea if they can be resolved without resort to evidence contradicting the indictments).

Dorsey does not dispute the allegations of the indictments or his factual guilt as to the charges. Dorsey instead contends that, given the facts to which he pleaded guilty, the imposition of multiple punishments for the unlawful possession of a firearm violates his guarantee against double jeopardy. His double-jeopardy claim thus is apparent on the face of the record and may be asserted for the first time on appeal because its resolution does not depend on further proceedings to introduce

additional evidence bearing on his factual guilt. *See Menna*, 423 U.S. at 62. n.2; *Denton*, 399 S.W.3d at 544. We therefore turn to the merits of Dorsey's claim.

**B.     Merits**

**1.       Applicable law**

The Fifth Amendment to the United States Constitution guarantees that a defendant shall not be subject to double jeopardy. Among other things, it prohibits the imposition of multiple punishments for the same offense. *Bien v. State*, 550 S.W.3d 180, 184 (Tex. Crim. App. 2018). When a defendant asserts a multiple-punishments double-jeopardy claim, our analysis turns on whether the legislature intended multiple punishments. *Stevenson v. State*, 499 S.W.3d 842, 850 (Tex. Crim. App. 2016). Whether offenses are the same and disallow multiple punishments thus requires us to decide the number of punishments contemplated by the legislature. *Id.* Because the offenses at issue are codified in a single statutory provision—section 46.04(a) of the Penal Code—we discern the legislature's intent by conducting a units-of-prosecution analysis, which considers what the allowable unit of prosecution is, based on the statute's construction, the offense's gravamen, and how many units are shown by the evidence. *Id.* Double jeopardy is not violated if the legislature intended the offenses to be separate allowable units of prosecution. *Id.*

The gravamen of an offense is the best indicator of legislative intent when deciding whether a multiple-punishments double-jeopardy violation has occurred.

*Garfias v. State*, 424 S.W.3d 54, 59 (Tex. Crim. App. 2014); *see also Jones v. State*, 323 S.W.3d 885, 889 (Tex. Crim. App. 2010) (absent explicit statutory statement as to allowable unit of prosecution, best indicator is gravamen of offense). Thus, we look to the gravamen of the offense first. *See Stevenson*, 499 S.W.3d at 850. The gravamen of a given offense may be the result of the conduct, the nature of the conduct, or the circumstances surrounding the conduct. *Id.* Result-oriented offenses focus on result, which is the basis for prosecution. *Id.* Conduct-oriented offenses focus on the conduct, with different types of conduct constituting separate offenses. *Id.* Finally, circumstance-oriented offenses focus on the surrounding circumstances; different types of conduct may simply be alternate methods of proving a single offense, as opposed to separate ones, so long as the pertinent circumstances surrounding the conduct are the same. *Id.* at 850–51. In other words, the focus is on the particular circumstances that exist instead of the discrete, and perhaps different, acts that a defendant might commit under those circumstances. *Id.* at 851.

### 2. Analysis

The language of the felon-in-possession-of-firearm statute shows that the gravamen of the offense is the circumstances surrounding the proscribed conduct. The statute provides that:

> (a) A person who has been convicted of a felony commits an offense if he possesses a firearm:

16

(1) after conviction and before the fifth anniversary of the person's release from confinement following conviction of the felony or the person's release from supervision under community supervision, parole, or mandatory supervision, whichever date is later; or

(2) after the period described by Subdivision (1), at any location other than the premises at which the person lives.

TEX. PENAL CODE § 46.04(a). This section is a circumstances-surrounding-the-conduct offense because a violation arises only by the circumstance that the person has been adjudicated a felon. *See Stevenson*, 499 S.W.3d at 851 (statute criminalizing violations of sexually violent predator civil-commitment orders was circumstances-surrounding-conduct offense because violation arose only by circumstance that person had been adjudicated predator and civilly committed). In general, mere possession of firearms—particularly in one's home or vehicle—is lawful. *See* TEX. CONST. art. I, § 23; TEX. PENAL CODE § 46.02 (criminalizing carrying of handguns outside of one's premises or vehicles, subject to concealed-carry licensure); TEX. PENAL CODE § 46.03(a) (criminalizing carrying firearms in schools, polling places, courts, racetracks, airports, and places of execution). It is the very circumstance of being a felon the makes otherwise innocent conduct—firearm possession—criminal under section 46.04(a). *See Stevenson*, 499 S.W.3d at 851; *see also Tapps v. State*, 294 S.W.3d 175, 178–79 (Tex. Crim. App. 2009) (plain language of section 46.04(a) shows legislature enacted statute to prohibit all felons from possessing firearms); *Plummer v. State*, 426 S.W.3d 122, 127 (Tex. App.—

17

Houston [1st Dist.] 2012, pet. ref'd) (plain language of section 46.04(a) shows that its purpose is to criminalize possession of firearms by felons).

With the gravamen of the offense identified, we turn to the record evidence. *See Stevenson*, 499 S.W.3d at 851. Dorsey was charged with and pleaded guilty to being a felon in possession of a firearm before the fifth anniversary of his release from supervision under parole. *See* TEX. PENAL CODE § 46.04(a)(1). He also was charged with and pleaded guilty to being a felon in possession of a firearm outside of his home. *See id.* § 46.04(a)(2). Based on the undisputed evidence introduced at the suppression hearing, law enforcement officers found five firearms in Dorsey's home. While the gravamen of the offense can be generally described as "felon-in-possession-of-firearm," the legislature, when drafting the statute, specified that an offense can occur in both of two separate circumstances: anywhere, within five years of release from confinement, and thereafter in any place other than the premises at which the felon lives. Benson had multiple felony convictions, of various ages. While most were older, and therefore relevant only to section 46.04(a)(2), at least one placed him in the ambit of section 46.04(a)(1), which prohibits a felon from possessing a firearm anywhere.

The separateness of the offenses is further bolstered by the fact that Dorsey possessed multiple firearms. While it is not clear which of his five firearms he had with him in his truck in violation of section 46.04(a)(2), the possession of any one

of the other four in the premises in which he lived was a violation of section 46.04(a)(1). Because Dorsey's particular circumstances included at least two separate prior felonies, and the possession of at least two separate firearms in two separate locations, each felon-in-possession conviction was wholly independent of the other. In Dorsey's situation, then, double jeopardy cannot attach. *See, e.g., Huffman v. State*, 267 S.W.3d 902, 908 (Tex. Crim. App. 2008) (citing *Spradling v. State*, 773 S.W.2d 553, 556–57 (Tex. Crim. App. 1989) ("[W]e have held that a separate prosecution for failure to stop and render aid can occur for each individual injured in the accident whom the defendant fails to aid."), *superseded by statute on other grounds as recognized in Curry v. State*, PD-0577-18, 2019 WL 5587330, — S.W.3d — (Tex. Crim. App. Oct. 30, 2019).

## CONCLUSION

We affirm the trial court's judgments of conviction in case numbers 1569925, 1570348, and 1570349.



Peter Kelly
Justice

Panel consists of Justices Keyes, Kelly, and Goodman.

Justice Goodman, dissenting.

Publish. TEX. R. APP. P. 47.2(b).

19